UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

      v.

IAN CAMPBELL GENT and
JAMES LAGONA,

                    Defendants.

**DECISION AND ORDER**
10-CR-90S

## I.  INTRODUCTION

On February 23, 2011, after an eleven-day trial, the jury returned a guilty verdict against Defendant Ian Campbell Gent on counts 5 through 27 of a 27-count redacted indictment, which charged him with violating 18 U.S.C. §§ 2, 1341 (mail fraud and aiding and abetting mail fraud) and 18 U.S.C. § 1349 (conspiracy to commit mail fraud).  The jury also returned a guilty verdict against Defendant James Lagona on all 27 counts of the redacted indictment, with counts 1-4 of that indictment also being for violations of 18 U.S.C. §§ 2, 1341.

Defendants now each move this Court to grant a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure or, alternatively, a new trial pursuant to Rule 33.  For the reasons discussed below, Defendants' motions for judgments of acquittal and new trials are denied.

## II.  BACKGROUND

The charges of mail fraud and conspiracy to commit mail fraud relate to Defendants' involvement in the sale of debentures under the names Watermark Financial Services

1

Group or Watermark M-One Holdings, Inc. (Tr. 60-61; Gov't Exs. 4.04, 5.21, 11.19, 12.11, 12.25, 12.39, 22.20, 22.22, 22.23, 28, 30, 64). Starting in January 2006, sales staff, originally hired by M-One Financial prior to the formation of Watermark Financial Services in 2005, would offer clients investment opportunities in one- or two-year debentures that promised 10% annual interest. (Tr. 53, 59-62; Deposition of Lorenzo Altadonna, Gov't Ex. 201, at 23).   The prospective investments pitched to clients included real estate development in Maine and a health insurance network for religious institutions. (T. 60, 397-398, 403-404, 643; Altadonna Dep. at 91-93; Gov't Ex. 29).   Sales staff had interested clients sign paperwork opening self-directed individual retirement accounts ("IRA"s) with PENSCO Trust Company, a custodian for such accounts,[1] into which client funds were either directly deposited or rolled-over from an existent IRA. (Tr. 173, 397-398, 636).  This same paperwork also authorized transfer of funds from the newly created PENSCO account back to Watermark for the debentures. (See e.g. Gov't Ex. 5.13).   Clients who invested did not understand that the "convertible debentures" they were purchasing were unsecured loans to Watermark which, prior to the due date for repayment, could be converted into shares of common stock in the company. (Tr. 398; Altadonna Dep at 132; see e.g. Gov't Ex. 30 at 1, 3). The clients that testified at trial explained that, based on representations made to them, they believed that they were making a safe, guaranteed investment with little to no risk.  (Tr.  387-389, 402-403, 413, 555, 585, 592-595, 693, 704-705). Between January 2006 and May 2008, $6,758,027 was solicited from clients,

---

[1]There is no allegation that PENSCO is affiliated with or an alter ego of M-One or Watermark. Tr. 450-451. Individuals are not allowed to hold their own assets within retirement accounts, therefore retirement funds are often placed with a qualified custodian such as PENSCO which houses the account and reports the value thereof to both the client and the IRS. Tr. 448-451, 636. A self-directed IRA allows the client, rather than a financial advisor, to make investment decisions. Tr. 448.

however, only $241,000 was actually invested, and only $545,064 in principal and/or interest was returned to clients. Tr. 1018-1026; Gov't Ex. 100.25.

Defendants Ian Campbell Gent and James Lagona were originally indicted along with Guy W. Gane, Jr., for mail fraud and conspiracy.  Docket No. 1. Gane subsequently pleaded guilty to one count of mail fraud in violation of 18 U.S.C. § 1341 and one count of money laundering in violation of 18 U.S.C. § 1957.   (Docket No. 35).   A jury trial commenced before this Court on the charges against the remaining Defendants, at which Gane testified as part of the Government's case in chief.   After the close of the Government's proof, this Court dismissed Counts 25, 28, 29 and 31 of the original indictment upon the Government's motion. (Tr. 1030-1031).  Defendants Gent and Lagona each moved for a judgment of acquittal pursuant to Rule 29. (Tr. 1041-1043, 1047). Defendant Gent's motion was granted insofar as Counts 1, 2, 3, and 4 were dismissed against him, but otherwise denied. (Tr. 1054-1055).   Defendant Lagona's motion was denied in its entirety.  (Id.).

Following this Court's ruling, each Defendant testified in his own behalf, and the Government presented one rebuttal witness.   The jury returned a guilty verdict against Defendant Gent on counts 5 through 27 of the redacted indictment, and a guilty verdict against Defendant Lagona on all 27 counts of the redacted indictment. Following the verdict, Defendants each moved for a judgment of acquittal and, alternatively, for a new trial.

### III.  DISCUSSION

**A.      Rule 29**

Pursuant to Rule 29, a court must, upon a defendant's motion,[2] "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." A defendant challenging the sufficiency of the evidence bears a heavy burden.  United States v. Finley, 245 F.3d 199, 202 (2d Cir. 2001), cert denied 534 U.S. 1144 (2002).  "In evaluating whether the evidence was sufficient to convict a defendant, [a reviewing court] consider[s] all of the evidence, both direct and circumstantial, 'in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government.'" United States v. Velasquez, 271 F.3d 364, 370 (2d Cir. 2001), cert denied 535 U.S. 965 (2002), quoting United States v. Walker, 191 F.3d 326, 333 (2d Cir. 1999), cert denied 529 U.S. 1080 (2000).  When considering the trial evidence, "the court must be careful to avoid usurping the role of the jury."  United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003). The court may not "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999)(internal quotation marks and citations omitted).  The credibility of the witnesses falls strictly within the province of the

---

[2]In support of his Rule 29 motion(Docket No. 90) and supplemental motion for a judgment of acquittal (Docket No. 144), Defendant Lagona submitted supporting Memoranda of Law (Docket Nos. 91, 144), to which the Government responded with an opposing Memoranda of Law (Docket Nos. 154, 159). Lagona filed reply Memoranda of Law (Docket Nos. 155, 160), and adopted the arguments raised by Gent to the extent applicable to him.

In support of his Rule 29 motion for a judgment of acquittal (Docket No. 88), Defendant Gent submitted the Affidavit of Robert A. Liebers, Esq., with Exhibits A-B (Docket No. 88-1), to which the Government responded with opposing Memorandum of Law (Docket No. 98).  Gent submitted a reply Memorandum of Law (Docket No. 103) and the supplemental Affidavit of Liebers (Docket No. 124). The Government responded with an opposing Memorandum of Law (Docket No. 131), and Gent filed a reply Memorandum of Law (Docket No. 147).  Gent also adopted Lagona's arguments insofar as applicable to him.

jury. Guadagna, 183 F.3d at 129 (noting that the court must defer to the jury even if the evidence would also support, in the court's opinion, a different result). A judgment of acquittal is warranted only if the court concludes that the evidence that the defendant committed the crime is non-existent or so meager no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Velasquez, 271 F.3d at 270; Guadagna, 183 F.3d at 130.

In determining whether a defendant is entitled to an acquittal, the evidence is considered "in its totality, not in isolation, and the government need not negate every possible theory of innocence." United States v. Cote, 544 F.3d 88, 98 (2d Cir. 2008); see Guadagna, 183 F.3d at 130 ("each fact may gain color from the others"). "[W]hen a motion for judgment of acquittal made at the close of the government's case-in-chief is denied and a defendant presents a case, then the evidence put in by the defense will also be considered in deciding a Fed.R.Crim.P. 29(c) motion made after the trial ends." United States v. Truman, 762 F.Supp.2d 437, 445 (N.D.N.Y. 2011); Velasquez, 271 F.3d at 371. Here, each Defendant moved for acquittal at the close of the Government's case-in-chief, Tr. 1041-1047, and each decided to testify on his own behalf following this Court's denial, in whole or in part, of his motion. Tr. 1054-1055, 1062, 1278. Defendants have therefore waived any claim as to the sufficiency of the Government's cases considered alone. Velasquez, 271 F.3d at 371. "A defendant's testimony may thus add weight to the government's case. To put it another way, a jury may 'use its disbelief [of a defendant's testimony] to supplement the other evidence against him.' " Velasquez, 271 F.3d at 371, quoting United States v. Stanley, 928 F.2d 575, 577 (2d Cir.1991).

Defendants were convicted of violating 18 U.S.C. §§ 2, 1341, and 1349 for acts of

mail fraud, aiding and abetting mail fraud, and conspiracy to commit mail fraud.  The substantive counts of mail fraud have "three elements: (1) use of the mails to further (2) a scheme to defraud with (3) money or property as the object of the scheme."  United States v. Kinney, 211 F.3d 13, 17 (2d Cir. 2000), cert denied 531 U.S. 1079 (2001)(quotation marks omitted); see United States v. Somerstein, 971 F.Supp. 736, 741 (E.D.N.Y. 1997)(a conviction requires a specific intent to defraud).  To establish the 'use of the mails' element, the Government must show either that the use of the mails would follow in the ordinary course of business, or that such use could reasonably be foreseen, even if not actually intended.  United States v. Alkins, 925 F.2d 541, 549 (2d Cir. 1991); see United States v. Naiman, 211 F.3d 40, 49 (2d Cir. 2000).  Because good faith is a complete defense to mail fraud, the government is also required to prove a lack of good faith beyond a reasonable doubt.  Alkins, 925 F.2d at 549-550.

"Conspiracy constitutes a crime, separate and distinct from the substantive offense." Somerstein, 971 F.Supp at 746; see 18 U.S.C. § 1349; United States v. Pinckney, 85 F.3d 4, 8 (2d Cir. 1996).  "Conspiracy requires proof of: (1) an agreement among the conspirators to commit an offense; (2) specific intent to achieve the objective of the conspiracy; and (3) usually, an overt act to effect the object of the conspiracy." Pinckney, 85 F.3d at 8.  "[I]n order to prove a defendant guilty of conspiracy, the government need not show that he knew all of the details of the conspiracy, so long as he knew its general nature and extent." United States v. Rosa, 17 F.3d 1531, 1543 (2d Cir. 1994), cert denied 513 U.S. 879 (1994).  Circumstantial evidence may be sufficient to establish that a defendant knowingly joined and participated in the charged conspiracy. Rosa, 17 F.3d at 1543-1544.  "The deference accorded to the jury's verdict 'is especially important when

reviewing a conviction of conspiracy ... because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.' " United States v. Guerrero, __ F. Supp.2d __, 2011 WL 6013957, *19 (S.D.N.Y. 2011), quoting United States v. Pitre, 960 F.2d 1112, 1121 (2d Cir.1992).

Finally, as charged here, each Defendant could be found criminally liable for each mail fraud count based upon a finding that he willfully caused or aided and abetted the commission of the crime.  18 U.S.C. § 2; Pereira v. United States, 347 U.S. 1, 9, 74 S.Ct. 358, 98 L.Ed. 435 (1954).  The jury was also charged that Defendants could be found guilty of the substantive mail fraud charges under a theory of coconspirator liability. Tr. 1533-1536. Under this theory, "[o]nce a conspiracy has been established, the criminal liability of its members extends to all acts of wrongdoing occurring during the course of and in furtherance of the conspiracy." United States v. Gallerani, 68 F.3d 611, 620 (2d Cir. 1995) (internal quotation marks omitted); see generally Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).  Thus, it was permissible for the jury to find each Defendant "guilty on a substantive count without specific evidence that he committed the act charged if it is clear that the offense had been committed, that it had been committed in the furtherance of an unlawful conspiracy, and that the defendant was a member of that conspiracy." Gallerani, 68 F.3d at 620 (internal quotation marks omitted).

This Court finds that there was sufficient evidence presented at trial from which the jury could conclude that the solicitation of investment funds was in fact a fraudulent scheme, that Gent and Lagona were each aware of the fraudulent nature and extent of that scheme, and that they collectively participated in furtherance of this scheme. Pinckney, 85

7

F.3d at 8; <u>Rosa</u>, 17 F.3d at 1543. There is also sufficient evidence to support the conclusion that the use of the mails, including a private commercial carrier, was reasonably foreseeable. <u>Alkins</u>, 925 F.2d at 549.

      1.    <u>Fraudulent scheme</u>

     Evidence supported a conclusion that the sales representations made to potential investors were false.  Individuals who invested funds offered testimony that a salesperson assured them that the investment was "guaranteed" and there was "no risk." Tr. 387-389, 402-403, 413, 555, 585, 592-595, 693, 704-705; Gov't Ex. 5.04; <u>see</u> Tr. 422-423, 428, 632 (corroborating testimony of salespersons).  A business plan for Watermark Financial prepared for prospective investors indicated that any idle funds would be invested in treasury bills. Tr. 80-81, Gov't Ex. 29.  Other witnesses testified that, based on the representations of salespersons, they believed that they were setting up a secure retirement account, and these witnesses did not understand that they were in fact making an unsecured loan.  Tr. 392, 515-516, 520, 523, 546-547, 549, 554, 585, 691.  One witness testified that he was led to believe that he was placing his money in something like a certificate of deposit "where you're guaranteed 10 percent of your initial investment after one year of maturity." Tr. 555.

     The 'guaranteed return of 10%' and the assurances of a stable, safe place to invest are belied by the record.  Gane testified that the incoming client funds were not invested in either real estate  or in treasury bills, but were used for salaries and expenses, including personal expenses such as alimony. Tr. 79-81, 96-97, 165.  Many potential investors were pitched on the development of Maine property even after that potential deal had fallen through, and no real estate investment was made during the two-plus years at issue. Tr.

63, 82, 257, 397-398, 401-403, 410-412, 643.   The investment documents prepared by salespeople and presented to clients for their signature revealed that clients were in fact opening or transferring funds into a self-directed IRA and then making an unsecured loan to Watermark.   See e.g. Gov't Exs. 5.07, 5.14-5.16, 5.21, 11.05-11.15, 12.07, 12.25. Witnesses who invested testified that these numerous forms were presented to them already completed, and the sales person would indicate where signatures were required. Tr. 513-514, 548, 588-589, 687-688.  Further testimony indicated that investors signed the forms without reading because they had discussed the investment with a salesperson they trusted.  Tr.  392, 522-523, 555, 590, 691, 729-730.   The jury was also presented with evidence that over six million dollars was received from investors between January 1, 2006 and  May  2008. Tr. 1018-1020, Gov't Ex. 100.25.   From those funds, however, only $545,064 was repaid to investors and only $241,000 was invested in startup companies. Tr. 1022-1026; Gov't Exs. 100, 100.25.  Witnesses also testified that they would not have invested if the true state of affairs had been clear, Tr. 527-528, 560, 694-695, and thus the "misrepresentations went to an essential element of the bargain." United States v. Schwartz, 924 F.2d 410, 420-421 (2d Cir. 1991); see United States v. Walker, 191 F.3d 326, 335-336 (2d Cir. 1999), cert denied 529 U.S. 1080 (2000); United States v. Kuna, 760 F.2d 813, 819-820 (7th Cir. 1985)(evidence that defendant concealed risk by sending false financial reports, promoting false sense of security, sufficient to support mail fraud conviction).

Despite the absence of all but nominal investments, clients were continuously assured that their accounts were doing well and had in fact already earned money.  Tr. 390, 530, 535-536, 564-565, 596-597, 600-601, 705-706, 708-718 731-732; Altadonna

Dep at 53; see United States v. Sampson, 371 U.S. 75, 80-81, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962)(the use of false assurances that promised services would be performed was part of fraudulent scheme); United States v. Angelilli, 660 F.2d 23, 36-37 (2d Cir. 1981), cert denied 455 U.S. 910 (1982)(same). Such assurances included those in the April 7, 2008 letters signed by Lagona stating that, according to Watermark records, investments had retained their full value plus interest. Gov't Exs. 5.02, 11.02, 17.02.  These letters were sent in response to letters from PENSCO to account holders devaluing the investments in Watermark due to a Securities and Exchange Commission ("SEC") investigation.  Tr. 182-186, 476-480, 651-652; see e.g. Gov't Ex. 5.03.  Based on testimony that Gane, Gent, and Lagona were aware that there were no assets and no investments at the time the Watermark response letters were sent, Tr. 183, 898-900, as well as evidence that investments continued to be solicited thereafter, Altadonna Dep at 91-93; Gov't Exs. 236, 237, the jury could have rationally concluded that these letters, like the interest payments to the initial investors, "were lulling devices which comprised part of the basic scheme and its desired continued perpetration; and that the scheme applied to persons already victimized to make them a prey for additional investment and to open the way for the successful pursuit of the scheme as to others." Bliss v. United States, 354 F.2d 456, 458 (8th Cir. 1966), cert denied 384 U.S. 963 (1966); see Sampson, 371 U.S. at 80-81; Kuna, 760 F.2d at 819-820. Thus, contrary to Defendants' contentions, these letters, which serve as the basis for Counts 23 through 26 of the redacted indictment, were properly found to be part of the fraudulent scheme.

There was therefore sufficient evidence from which the jury could find not just a fraudulent investment scheme, but also a specific intent to harm on the part of all

participants therein.  See Schwartz, 924 F2d at 421.

2.    Knowing and Voluntary Participation in the Fraudulent Scheme

Evidence also supports the conclusion that both Gent and Lagona knowingly participated together in the furtherance of this fraudulent scheme.  See Kinney, 211 F.3d at 17; Pickney, 85 F.3d at 8. Lagona was hired in 2005 to work for Watermark, prior to the sale of the first debenture in January 2006, and Gane informed him that the incoming funds would be used for salaries and expenses.  Tr. 67-68, 96.  Lagona prepared all debentures, Tr. 92-93, those initial debentures became due in January 2007, and Gane testified that Lagona was aware that no investments had been made, the investment funds had otherwise been spent, and new investment funds were being used to pay off the amounts owed. Tr. 84-90, 92-94 96-97; see Gov't Exs. 4.02, 4.03.  Lagona nonetheless continued to prepare debentures.  Tr. 92-93, 96-97. Gane further testified that shortly after Gent started his employment in the "middle of March, I believe, of 2007," Gane discussed with Gent and Lagona the use of new investor money to pay old investors. Tr. 102, 108. According to Gane, when he suggested that they contact the authorities, referencing the SEC and the National Association of Security Dealers ("NASD," subsequently named Financial Industry Regulatory Authority or "FINRA"), regarding the inability to repay investors, both Gent and Lagona told him that he was crazy.  Tr. 108-109, 824, 835. Gent responded that there were different ways to fix this problem than to go to the authorities. Tr. 109.   Both Lagona and Gent were also present when Gane asked bookkeeper Jane Furlani to take home financial records in late December 2007 or early January 2008 because FINRA or the SEC would want to review them. Tr. 773, 775-776. Furlani also testified that Gane, Gent, and Lagona were present at meetings "at least weekly" where

11

accounting concerns were discussed. Tr. 774. Diane Bonvissuto, the compliance officer, testified that she spoke with Gane, Gent, and Lagona regarding the possible improprieties with debenture sales, particularly with respect to whether the debentures constituted securities requiring registration. Tr. 835.

Gent and Lagona each directly interacted with clients, either by participating in sales meetings, Tr. 142-143, assuring clients that investments were doing well, Tr. 530, 729-732, or promising that funds were forthcoming.   Tr. 530, 602-604, 711-721.   Both were participants in discussions with Gane on, for example, convincing the Church of St. Albert the Great to continue its debenture on a month to month basis at a time when no funds were available to pay the amount due, Tr. 142-143, 880-881, and on the company's lack of assets as of January 2008. Tr. 898-900.  Further, Bonvissuto testified that Gent told her that she "really shouldn't be exposed to [debentures] in case [she] did have to testify.  They didn't want [her] to know anything." Tr. 822.  Gent told Bonvissuto that Gane needed "to continue to sell the debentures, and [Gent] talked to some other people, and they said basically whether you sell one or 100 debentures it's still going to be the same penalty. And they were trying to make it so that if they raised enough money, nobody would get hurt in this ordeal." Tr. 831-834.  Gent subsequently informed her that the FINRA representative gave the company permission to continue selling debentures "as long as nobody is going to lose any money and get hurt." Tr. 841.  Notably, that FINRA representative, Robert McCarthy, flatly denied during his testimony making any such representation to Gent, as using money obtained from later investors to pay off earlier ones "would have been indicative of a Ponzi scheme." Tr. 962.

The jury heard evidence that, in addition to preparing the debentures, Tr. 92-94,

Altadonna Dep. at 29-30, Lagona tracked or tallied the money coming in from the sale

thereof, Tr. 94, 843-845, and, according to one salesperson, explained the debentures to

the salespeople.  Altadonna Dep. at 132.  Further, contrary to his contention, there was

sufficient evidence that Lagona signed and sent the response letters to clients following

PENSCO's devaluing of investments with Watermark. Tr. 180-188, 651-655, 674-675,

1430-1432.  These letters from Lagona on behalf of 'WaterMark M-One' state that

investments had retained value and continued to accrue 10% per year. Tr. 186; Gov't Exs.

5.02, 11.02, 17.01, 22.02.  There was evidence that Lagona specifically discussed with

Gane the fact that these letters should indicate "[t]hat the customer's full value of their

account was on the books at Watermark M-One." Tr. 651-652. Gent also participated in

discussions regarding the need for these letters with Lagona before they were sent. Tr.

182-183, 651-652. As noted, Gane, Gent, and Lagona were aware at that time of the lack

of either assets or investments to support these assertions, therefore Watermark's records

could not have shown that the investments had retained full value plus interest. Tr. 183,

187-188, 898-900.  Additional investor funds were solicited even after these letters were

sent on or about April 7, 2008.  See Gov't Exs. 100.25, 236, 237.  Notably, one of those

later clients agreed to rollover  $76,000 of distributed IRA funds for the investment.

Altadonna Dep at 91-93; Gov't Ex. 237. Lorenzo Altadonna, who made this sale, testified

that this investment was required to go through PENSCO, but although the client filled out

the forms to do so, at Gane's instructions the check was made out directly  to Watermark

M-One Holdings. Altadonna Dep. at 92-93; Gov't Ex. 236.  Altadonna gave the completed

PENSO paperwork and the check to Gent, Altadonna Dep. at 94, following which the funds

were not sent to PENSCO, but were deposited in a Watermark account the next day.

Gov't Exs. 100.18, 100.25.

The jury could have reasonably concluded from the evidence above that Defendants were not acting in good faith. According to Gane, Gent initially proposed to 'repaper' the company, Tr. 101, 877. Gent testified that "what Watermark was trying to do" was engage in a process of admitting that notes or stock in a company were "unintentionally sold," and obtaining an exemption from the New York State Attorney General by offering those investors either a right of rescission or conversion of the note into an investment in the new company "[a]nd then everything is legal." Tr. 1096-1097; see 112. The jury could have concluded from this testimony that Gent recognized that the sale of debentures was improper, nonetheless debentures continued to be sold during Gent's tenure even as the interest on prior debentures came due. Gent also admitted that this right of rescission was never completed. Tr. 1098; see Tr. 112. Further, contrary to Lagona's arguments, there was no evidence that significant progress toward actual investments occurred. Although approximately $241,000 was invested in startup companies, it was rational for the jury to find this amount insignificant when compared with the over $6 million in investor funds received, and further conclude that the primary purpose of the operation was to fraudulently deprive clients of money.

There is also no merit in the argument that the evidence established Defendants' reasonable belief that a purported additional investor, Konstantinos "Kostas" Samouilidis, would commit $5 million dollars to purchase stock in Watermark. Tr. 120-122, 766-767, 1077-1087, 1232-1250. The jury was presented evidence that Defendants were involved with Samouilidis for over a year, during which time Samouilidis not only failed to invest any money, but in fact received over $600,000 in purported loans from Watermark. Tr. 123-

14

129, 130-131, 890-891, 901, 972-973, 991-993, 1101, 1104-1105, 1120, 1249-1250, 1267, 1315-1316; Altadonna Dep. at 111-117; Gov't Exs. 238-240.  No written agreement was ever executed with Samouilidis regarding these loans.  Tr. 767-768, 994, 1147-1148, 1261-1262; Altadonna Dep. at 119.  The jury could have rationally concluded from the evidence presented regarding Samouilidis that, as one witness testified, the process of constantly sending money to someone who ostensibly had millions of dollars to invest "sounded like a con," Tr. 768, and that any reliance on Samouilidis' promised investment was unreasonable.

Gent further argues that Count 5,[3] which alleges the use of the mails to defraud a client of $6,500 on March 22, 2007, must be dismissed as against him.  Gent argues that this charge predates any proof of his employment, as evidenced by an April 3, 2007 email from Gane indicating that Gent had been asked to become a paid consultant. Aff of Robert A. Liebers, Docket No. 88-1, ¶¶ 5-6, Ex. A; Gov't Ex. 3504.09. Gent correctly asserts that with regard to liability for substantive offenses, as opposed to liability for the conspiracy itself, "a defendant cannot be retroactively liable for offenses committed prior to his joining the conspiracy." United States v. Blackmon, 839 F.2d 900, 908-909 (2d Cir. 1988).  Here, however, the trial record contains sufficient evidence to support a jury finding that Gent entered into the conspiracy to defraud prior to March 2007.  Gane testified that he first began to speak with Gent regarding his business, then M-One Financial, in the fall of 2004 or beginning of 2005. Tr. 98-99.  Discussions regarding Gent joining Watermark as a consultant or employee were held in the fall of 2006 and into January and February 2007. Tr. 99.  Gane testified that he spoke with Gent about selling debentures in the "[v]ery

---

[3]All references are to the redacted indictment (Docket No. 80) presented to the jury.

beginning of 2007," specifically "January, February," prior to Gent becoming officially associated with Gane's company in the "middle of March, I believe, of 2007."  Tr. 100-101. Gent himself testified that Gane contacted him in the third week of March 2007. Tr. 1062-1063. Further, Gane's testimony that Gent became an employee in mid-March is not contradicted by Gane's April email, which recognizes that Gane had *already* asked Gent to become a paid consultant.  Gov't Ex. 3504.09. Indeed, as the Government notes, HSBC records for Watermark Financial Services Group show payments to Gent as early as February 9, 2007.  Gov't Ex. 100.15. There was therefore sufficient evidence that Gent was involved with the debenture scheme prior to March 22, 2007.

Gent further argues that Counts 6 through 14, which allege substantive mail fraud charges occurring from April 3, 2007 to August 29, 2007, must be dismissed because there was no evidence that he had any knowledge of these individual transactions.  Lieber Aff. ¶ 7.  Having concluded, however, that there was evidence from which the jury could have concluded that Gent entered the conspiracy earlier than March 22, 2007, and was a knowing participant therein, Gent's criminal liability "extends to all acts of wrongdoing occurring during the course of and in furtherance of the conspiracy" after that date, even in the absence of specific evidence that he participated in each occurrence of mail fraud. Gallerani, 68 F.3d at 620 (internal quotation marks omitted).

3.     Use or Cause of Use of the Mails in Furtherance of the Scheme

The Government also presented sufficient evidence that the 'use of the mails' would follow in the ordinary course of business. "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to

be used." Alkins, 925 F.2d at 549 (internal quotation marks omitted); see Naiman, 211 F.3d at 49.  As part of the sale of debentures, salespersons would have individual clients sign an application to open an account with PENSCO Trust Company.  Tr.170-173,  457-458, 512-522, 547-549, 586, 636, 687-688; See e.g. Gov't Exs. 5.07, 11.06, 12.05, 22.07, 235. PENSCO Trust Company was a New Hampshire based bank and trust with the primary business of acting as custodian for self-directed retirement accounts, and it had offices located in both New Hampshire and California.  Tr. 170-171. 447-450. Witnesses testified that the PENSCO forms they signed were completed by Watermark personnel.  Tr. 512-522,  549-555,  585-590,  636-637, 687-688,  691-692.     A PENSCO IRA Non-Public Investment Authorization directed that funds placed in the newly opened PENSCO account be sent to Watermark. Tr. 517-518, 551, 586-587, 689; Gov't Exs. 5.13, 11.13, 12.09, 22.14. The related PENSCO Payment and Funding form requires that the funds be sent via check overnight to the Watermark offices in Amherst, New York.  Tr. 171-172, 461-463, 518-519, 552-587, 689-690; Gov't Exs. 5.14, 11.14, 12.10, 22.15.  The completed, signed applications would then be submitted to PENSCO, and as a direct result, funds would be sent by check overnight via FedEx from PENSCO's California location to Watermark in New York.  Tr. 173-175, 461-463. Thus, there was sufficient evidence to conclude that the use of the mails would follow in the ordinary course of this scheme.  Alkins, 925 F.2d at 549.  Further, salesperson Deborah Galas testified that she mailed the letters responding to the PENSCO devaluation after Lagona signed them. Tr. 656, 674-675.

Finally, Gent argues that the Government failed to establish that FedEx is a private,

commercial shipping company, as required by 18 U.S.C. § 1341.[4]  Gent Supp. Mem of
Law, Docket No. 124-1, at 2-3.  Even if this Court were to assume that this fact is outside
the ken of the average juror, there was still sufficient evidence presented from which the
jury could have so concluded. Notably, "the [G]overnment was required to show that FedEx
is private or commercial, it does not have to show both." United States v. Mallory, __
F.Supp.2d __, 2010 WL 8375023, *2 (E.D.Va. 2010), affd __ Fed. Appx. __, 2012 WL
149797 (4th Cir. 2012).   The FedEx shipping labels in evidence[5] state "BILL SENDER,"
suggesting "that FedEx is an entity that derives revenue from the provision of
transportation services and thus it is 'commercial' in nature." Mallory, 2010 WL 8375023,
*2. The labels similarly support the conclusion that FedEx is a carrier, inasmuch as the
references to billing and shipping charges indicates "that FedEx is an entity that contracts
to transport goods for a fee." Id. at *3.  Finally, the labels indicate that the checks were
shipped interstate between San Francisco, California and Amherst, New York.  See Id. at
*3.

This Court therefore finds that there was sufficient evidence supporting the jury
verdict on all counts, and Defendants' motions for judgments of acquittal are denied.


**B.    Rule 33**

Rule 33 provides that a court may grant a defendant's motion for a new trial "if the
interest of justice so requires." A district court "has broader discretion to grant a new trial

---

[4] 18 U.S.C. § 1341 prohibits the use of "any private or commercial interstate carrier" as well as the U.S. Postal Service in the furtherance of a fraudulent scheme or artifice.

[5] See Gov't Exs. 1.01, 2.01, 3.01, 5.01, 6.01, 7.01, 8.01, 9.01, 10.01, 11.01, 12.01, 12.02, 13.01, 14.01, 14.02, 15.01, 16.01, 20.01, 21.01, 22.01, 23.01, 24.01.

under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority 'sparingly' and only in 'the most extraordinary circumstances.' " <u>United States v. Ferguson</u>, 246 F.3d 129, 134 (2d Cir.2001), <u>quoting</u> <u>United States v. Sanchez</u>, 969 F.2d 1409, 1414 (2d Cir.1992).  "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be manifest injustice.... There must be a real concern that an innocent person may have been convicted." <u>Ferguson</u>, 246 F.3d at 134.  A reviewing court must be satisfied that "competent, satisfactory and sufficient evidence" in the record supports the jury verdict. <u>Sanchez</u>, 969 F.2d at 1414 (internal quotation marks omitted).

    1.   <u>New Evidence</u>

Both Defendants Gent[6] and Lagona[7] assert that new evidence exists which warrants granting a new trial.  "A new trial pursuant to Rule 33 based on newly discovered evidence may be granted 'only upon a showing that the evidence could not with due diligence have been discovered before or during trial, that the evidence is material, not cumulative, and that admission of the evidence would probably lead to an acquittal.' " <u>United States v.</u> <u>Owen</u>, 500 F.3d 83, 87 (2d Cir. 2007), <u>cert denied</u> 552 U.S. 1237(2008), <u>quoting United</u> <u>States v. Alessi</u>, 638 F.2d 466, 479 (2d Cir.1980).

Gent argues that a letter submitted by Gane to this Court in connection with his

---

[6]In support of his Rule 33 motion, Defendant Gent submitted the Affidavit of Robert A. Liebers, Esq. (Docket No. 123-1) and a supporting Memorandum of Law (Docket No. 123-2).  The Government filed a Response in Opposition (Docket No. 130), to which Defendant Gent submitted a Reply (Docket No. 148). Gent also adopts all of Lagona's arguments to the extent applicable to him.

[7]In support of his Rule 33 motion, Defendant Lagona submitted a supporting Memorandum of Law (Docket Nos. 152 (corrected version), 93, 151), and a Supplemental Memorandum of Law (Docket No. 145).  The Government responded with a Memorandum of Law in Opposition (Docket No. 153), and Lagona filed a Reply Memorandum of Law (Docket No. 156). Lagona adopts all of Gent's arguments to the extent applicable to him.

sentencing constitutes new evidence in the present case.  See Docket No. 111 Ex. B.  In this letter, Gane stated that "[a]t no time did I ever intend to harm or steal from my investors."  Id.  Gent asserts that this statement directly contradicts Gane's trial testimony, wherein Gane admitted to "running a Ponzi scheme." Lieber Aff., Docket No. 123-1, ¶ 15, quoting Tr. 178.  He argues that Gane's "recantation" warrants a new trial because if Gane had testified that he lacked criminal intent, Gent would have had a much greater likelihood of acquittal.  Gent Mem of Law, Docket No. 123-2, at 6.  This argument is without merit. Gane's sentencing statement is consistent with his trial testimony that he never *originally* intended to create a Ponzi scheme, but believed that investment projects would start generating income. Tr. 63, 197.  Notably, Gent's counsel cross-examined Gane specifically on this original intent.  Tr. 197-199.  Nonetheless, Gane further testified that, despite his initial intention, he started using new investor money to pay of old investors, knowing it was wrong, to buy time when he realized that the "projects weren't coming to fruition at all.  I kept buying more time and I had no right to do it, but I used other people's money to try and buy time." Tr. 88-89, 164.  Gane's sentencing statement is therefore merely cumulative of trial testimony, and does not warrant a new trial.

In his Rule 33 motion, Defendant Lagona asserts that after the end of his trial he discovered that Gane had been involved in a previous financial scheme to defraud clients, and argues that this information constitutes new evidence warranting another trial.  Lagona Mem of Law, Docket No. 152, at 20.  Lagona further argues that the Government's failure to turn over this information was itself a *Brady* violation. Id.; see generally Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).  Initially, although Lagona asserts that Gane was previously prosecuted by the New York State Attorney General's

Office for a fraudulent financial scheme, Lagona Mem of Law, Docket No. 152, at 25, he offers no specifics and no support for this assertion. In any event, Lagona has failed to establish that the "admission of [this] evidence would probably lead to an acquittal." Owen, 500 F.3d at 87 (internal quotation marks omitted). He argues that evidence of the previous scheme "speaks directly to Gane's character and Gane's credibility, or lack thereof," Lagona Mem of Law, Docket No. 152, at 20-21; United States v. Rivas, 377 F.3d 195, 199 (2d Cir. 2004)(to establish "a true *Brady* violation" the allegedly withheld evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching"). As concluded above, however, there was sufficient evidence to support the jury's conclusion that Lagona had knowledge of and actively participated in the present scheme with Gane. Evidence that Gane had participated in a prior fraudulent scheme would have therefore undermined that part of Gane's testimony arguably favorable to Lagona: Gane's assertion that he never initially intended to defraud clients. See Rivas, 377 F.3d at 199 (new evidence is assessed in light of the total record). This purported new evidence is not favorable to Lagona, and a new trial is not warranted on this ground.

        2.    Ineffective Assistance of Counsel

Lagona argues that he was deprived of effective assistance of counsel due to the failure to make pretrial motions for either severance or the preclusion of any reference to Lagona's psychic activities; failure to introduce exculpatory evidence, failure to raise appropriate evidentiary objections, and the failure to object to misleading jury instructions. To establish that a new trial is warranted due to counsel's ineffective assistance, a defendant must establish that his counsel's performance fell below an objective standard of reasonableness, and that, but for defense counsel's errors, there is a reasonable

likelihood that the outcome of the proceeding would have been different.  Strickland v. United States, 466 U.S. 668, 686-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); United States v. Ramos, No. 06-CR-172, 2011 WL 291874, *3 (S.D.N.Y. Jan. 13, 2011). "In assessing the first element, the court 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " United States v. Kirsh, 54 F.3d 1062, 1071 (2d Cir. 1995), cert denied, 516 U.S. 927 (1995), quoting Striclkand, 466 U.S. at 689. Consideration of Lagona's ineffective assistance claim is appropriate on this Rule 33 motion because the arguments are directed at the conduct of prior counsel.[8] Ramos, 2011 WL 291874, *3, citing United States v. Brown, 623 F.3d 104, 113 (2d Cir. 2010); see Docket No. 97.

### a.  Tainted Jury Pool

Lagona argues that his counsel's failure to timely move to preclude or object to references to Lagona's activities as a psychic-medium allowed the jury pool to become prejudicially tainted against him.  Lagona Mem. of Law, Docket No. 152, at 25-26; Lagona Supp. Mem. of Law, Docket No. 145, at 2-11.  In his arguments in support of his motion for a new trial, Lagona concedes that the Court questioned and instructed the prospective jurors in an effort to reduce bias, and excused those who adamantly stated that they could not be fair.  Supp. Mem. of Law, Docket No. 145, at 11.  Lagona nonetheless argues that the trial "was tainted by lingering suggestions and implications concerning religion and the paranormal" which created doubts about Lagona's credibility.  Id. at 11.

During voir dire, this Court asked potential jurors, at the Government's request

---

[8]Lagona's initial submissions on both his Rule 29 and Rule 33 motions were pro se.  Docket Nos. 91, 93, 152.  Supplemental and Reply Memoranda of Law were prepared by newly assigned counsel. Docket Nos. 144, 145, 155, 156.

(Docket No. 43) and without objection from counsel, questions regarding religion as well as their feelings toward a potential "psychic element in this case." Transcript of Jury Selection ("JS") 68.  These questions included whether any juror was a member of or had strong feelings regarding either the Western Right Orthodox Catholic Church or the Roman Catholic Church, whether any juror had "ever been to Lily Dale or visited a psychic," and whether anyone was "a member of the Spirit Way Project." JS 68.  Following a series of unrelated questions, the prospective jurors were then asked if anyone had deeply rooted feelings that could not be set aside with respect to, among other things, religion.  One prospective juror answered:

> Yes, it's regarding Lily Dale and the psychic witnesses.  I'm a very strong Christian and I believe that these are untrue spirits and if there is a testimony, I will definitely not buy their testimony and I will always be partial to that.  My belief is teaching me that they are liars and there is no court system in the world that's going to tell me to be willing to believe the lie of the Lily Dale.  So that's my problem with – if there is any of that, I'm just flat saying I would not.

JS. 79-80.  Another prospective juror agreed with this opinion.  JS 80. In response to the Court's question, defense counsel stated that "it will be mentioned by the government witnesses that in addition to being an attorney, Mr. Lagona is a psychic." JS 80. The two objecting prospective jurors were excused, following which those remaining were admonished:

> Let me emphasize everything, ladies and gentlemen.  You're hearing personal views and personal views are not to be imposed on you. Individuals are entitled to their views and what you hear should not in any way review it as an attempt to persuade you.  You have to make up your minds and your [judgments] fairly and impartially on everything that's presented to you.  I'm letting these statements be made so that the individual is either comfortable or not serving as a juror.  You may not have thought about psychics and credibility and I don't know if there is incredibility or credibility, whatever because there may be.

Again, witnesses whomever they are and whatever they are are to be assessed equally taking into account factors that can be considered in properly determining credibility or incredibility in whole or in part and that is part of the difficulty of the process because you have to, in getting to your verdict, assess who to believe in part, in whole or not.  And that's what it's all about.  You're hearing individual views that should not be taken by you as gospel with respect to your mindset and you are to pursue a determination of what's right and fair and just according to the instructions that I give you according to credibility and whether the burden of proof has been satisfied by the Government.

JS 81.  A third prospective juror was extensively questioned on her ability to separate her own spiritual beliefs from her duty to make a determination based upon the evidence presented, during which the following exchange occurred:

Prospective Juror:   You explained it to me, that's what made me say what I said.  There's a difference.  You have spiritual conviction and you have to live up to your conviction if it interferes with your spiritual conviction. But this is a civil penalty and you go by what's presented to you and you decide from there.

The Court:   Well, what [we're] talking about, when I went through my questions is the Catholic faith, the Eastern Orthodox I think.

Prospective Juror:   Yeah.

The Court:   The psychic aspect is a different consideration, but they're factors to be considered in getting to resolve the ultimate issues.

Prospective Juror:   Well, in this case I'm saying he has to render under Caesar.  Who is Caesar? Caesar being the law and he has to obey the law and if he's broken the law that you've asked of him, then he has to pay the penalty and that has nothing to do with my relationship to God.

The Court:   Okay. And I think that's a fair statement.  You're asked to carry out your function according to the oath that you took?

Prospective Juror:   Exactly.

The Court:   And you will be sworn again - -

24

Prospective Juror:   I know.

The Court:   - - provided you are selected. And then the law applies to everybody equally across the board.

Prospective Juror:   Exactly.

The Court:   And you might have to figure through a consideration of different aspects.   I'm not saying whether it's the psychic aspect or not, I don't know, but it may be in the mix and it may be a proper consideration and if it's not, then it's up to me to give you the proper instruction on what to consider or not, okay? It may appear at first blush to be complex, but my job will to be [to] put it in a slot for you where you can consider it or not based on what's proper under the law.

JS 83-84.  This Court then accepted this potential juror's additional assurance that she could act as an impartial juror if selected. JS 81-85.

A fourth potential juror also hesitated at this point, stating that he did not believe in psychics and that a "psychic lawyer sounds like some kind of bad movie. Are we supposed to believe his word over - - you mentioned a priest earlier." JS 86.  This Court answered:

But you haven't heard evidence or explanation and that has no burden whatsoever.  Let's assume for the moment that he may be a psychic or that - - and you heard his attorney mention that Mr. Lagona is a psychic, but there's no evidence of that. Okay. So all you know is what we're talking about right here. It may or may not be a valid consideration during the course of the deliberative process in this case, okay? And if there's no evidence of something, there's nothing to consider, all right?

JS 86. The prospective juror asked whether, "[i]f he took the stand, are we supposed to believe or not believe him." JS 87. The Court replied:

[E]verybody starts out with a clean slate, everybody is not distinguished by status, by position, whatever that person is or say he or she is.  You take everything that is testified to by that witness in terms of what he saw, did, background, if he tells you or somebody tells you that he or she is a psychic, how if it's important it can be testified to and about and then you look at everything in the mix without prejudging that person.

25

JS 87. Upon further questioning, this potential juror agreed that he could make an individual determination.  JS. 87-88.

In light of the reservations of the four potential jurors, Lagona's trial counsel requested and was granted permission to conduct further voir dire regarding any potential bias or credibility issues.  JS 127, 134-135.  The Court additionally asked if there was "anybody who feels that he or she cannot afford either Mr. Lagona in particular, but either of the Defendants or the Government a fair trial in this case employing all of the proper considerations and instructions that I give to you?" JS. 135. No further questions were raised by any prospective juror.

Defense counsel's decision to allow the potential jurors to be questioned regarding possible bias related to 'psychic' matters "was neither so unreasonable nor so prejudicial as to meet either prong of Strickland." United States v. Price, 443 Fed. Appx. 576, 579 (2d Cir. 2011)(strategic decision to ask during voir dire about potential prejudicial impact of defendant's nickname, "Crime," rather than moving to preclude all references to same, was not unreasonable).  Notably, Lagona does not challenge the seating of any particular juror and fails to cite any evidence of actual prejudice that might support a contention of prejudicial jury bias. See Knapp v. Leonardo, 46 F.3d 170, 176 (2d Cir. 1995), cert denied 515 U.S. 1136 (1995).  Instead, his arguments only speculate that the references to psychic mediums made during jury selection opened the door to the potential for such bias.

> To hold that the mere existence of any preconceived notion as to guilt or innocence of the accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the  juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); see Knapp, 46 F.3d

at 176; United States v. Nicolo, 523 F.Supp.2d 303, 318-319 (W.D.N.Y. 2007), affd 421 Fed. Appx. 57 (2d Cir. 2011), cert denied 132 S.Ct. 338 (2011). "[T]he Constitution does not require ignorant jurors, only impartial ones," Knapp, 46 F.3d at 176, and here the potential jurors were questioned specifically and to defense counsel's satisfaction about the possibility of bias or prejudice.

This Court finds no merit in Lagona's argument that prospective jurors were told that the religious beliefs of a trial witness could factor into their deliberations. Lagona Supp. Mem. of Law, Docket No. 145, at 12, Lagona Reply Mem. of Law, Docket No. 156, at 7. In light of the complete transcript of jury selection, the references to religion quoted out-of-context by Lagona in fact pertain to each juror's ability to *set aside* their own religious views and base their decision on the evidence presented. "[I]n all cases, juries are presumed to follow the court's instructions," CSX Trasp., Inc. v. Hensley, 556 U.S. 838, 841, 129 S.Ct. 2139, 173 L.Ed.2d 1184 (2009), and as conceded, this Court instructed the potential jurors prior to trial and the jury itself during trial regarding the duty to reach a determination based solely on the evidence presented. JS 80-84, 86, 88; Tr. 1454-1457, 1462, 1466-1467. The jury was again instructed prior to deliberating that "in arriving at whether the government has proven its case beyond a reasonable doubt, you [have] got to divorce out personal feelings about the [D]efendants, about race religion, national origin, sex or age." Tr. 1466.

Accordingly, "[t]here is nothing in the record to suggest that the jurors ultimately selected failed to meet the jury standards and were unable to reach a fair and unbiased verdict." United States v. Gonzalez, 483 F.2d 223, 226 (2d Cir. 1973); United States v. Devery, 935 F.Supp. 393, 405 (S.D.N.Y. 1996), affd 128 F.3d 38 (2d Cir. 1997), cert denied 523 U.S. 1065 (1998).

27

### b. Prejudicial Evidence

Lagona argues that he was denied a fair trial due to the introduction of testimony that wrongfully suggested illegality and other wrongdoing unrelated to the elements of mail fraud and conspiracy to commit same, and such evidence tainted and confused the issues at trial. Lagona Supp. Mem. of Law, Docket No. 145, at 15-20. Specifically, Lagona asserts that references to "Ponzi schemes" and to the necessity of registering the debentures as securities had an improper effect on the jury's consideration of the case. Id. at 16-17.

Initially, the term 'Ponzi scheme' was used only sporadically over the course of this eleven-day trial. Tr. 19, 88-89, 178, 611-615, 962, 1164-1165; see Price, 443 Fed. Appx. at 579 (no reasonable probability of altering the result of the proceeding from occasional use of defendant's "Crime" nickname). Gane and FINRA representative Robert McCarthy testified that the term 'Ponzi scheme' is a reference to when new investor money is used to pay off previous investors. Tr. 88-89, 956-957, 962. The jury was also afforded Gent's explanation of the term, which was that:

> A Ponzi scheme is defined [as] what Ponzi was doing, and he was selling a trading program and postage stamps and offering excessive rates of return in a very short period of time, like three months, and promising 50 percent or 100 percent of the money. It uses shills to promote it. And the payments and the promotion of the profits are used to induce more people to come to the situation.

Tr. 1164. Gent distinguished this from a situation where a company is doing something that "has value, has filed an offering document or has an offering document, and has a means of paying it all back, then the Ponzi element disappears, because that's just like a bank selling CDs." Tr. 1164-1165. Thus, the testimony regarding Ponzi schemes

highlighted that a primary question for the jury's consideration was the existence of fraudulent intent, an essential element of mail fraud. See Somerstein, 971 F.Supp. at 741. In any event, the Court instructed the jurors that they were not to consider "similar cases that might involve Ponzi schemes or whatever in the media that are unrelated to this case . . . so that fairness is done to both sides in this particular case." Tr. 864; see CSX Trasp., Inc., 556 U.S. at 841.

With respect to evidence regarding the need to register debentures as securities, "it is a general principle of law, that whenever a fraudulent intention is to be established, collateral facts tending to show such intention are admissible proof." United States v. Lamont, 565 F.2d 212, 215 (2d Cir. 1977), cert denied, 435 U.S. 914 (1978)(citation omitted).  Thus, evidence that Defendants knew of or believed there to be such a requirement and consciously ignored it is probative of fraudulent intent. United States v. Cusack, 229 F.3d 344, 347-348 (2d Cir. 2000); United States v. Eisner, 59 Fed. Appx. 379, 382-383 (2d Cir. 2003).  Further, there was also evidence presented that the debentures were not required to be registered, including testimony that the debentures were not securities, Tr. 1142-1143, and that Defendants had received legal advice to that effect, Tr. 284-287, 839, 1088-1089, 1143-1144, 1298-1301. McCarthy, the FINRA representative with approximately fifteen years experience with that organization, could not rule out the possibility of a debenture that was not a security. Tr. 956-957, 964.  Thus, testimony regarding a debenture's status as a security also provided evidence from which the jury could have concluded that Defendants were acting in good faith, and the ultimate resolution of any such conflicting evidence fell squarely in the province of the jury.

*c.  Misleading Jury Instruction*

Lagona further argues that the jury instructions were misleading and presented a substantial likelihood that he was wrongly convicted based upon juror confusion. Lagona Supp. Mem. of Law, Docket No. 145, at 11. "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law, and an erroneous instruction, unless harmless, requires a new trial." United States v. Jordan, 591 F.Supp.2d 686, 721 (S.D.N.Y. 2008)(internal quotation marks omitted). Initially, Lagona does not take issue with the fact that this Court charged the jury on co-conspirator liability for the substantive mail fraud counts, as requested by the Government. Docket No. 55.  The relevant portion of this charge requires the jury to find:

> First, that the crime charged in the substantive count was committed;
>
> Second, that the person or persons you find actually committed the crime were members of the conspiracy you found to have existed;
>
> Third, that the substantive crime was committed pursuant to the common plan and understanding you found to exist among the co-conspirators;
>
> Fourth, that the defendant was a member of the conspiracy at the time the substantive crime was committed;
>
> Fifth, that the defendant could have reasonably foreseen that the substantive crime might be committed by his co-conspirators.

Docket No. 55 at 2-3.

Lagona argues instead that the Court's instructions related to this charge as delivered at trial were misleading:

> But what this says is you may find without establishing all of the elements of mail fraud if the proof beyond a reasonable doubt establishes these five elemental considerations.  First, that the *crime charged in the substantive count was committed*, mail fraud.

Two, that the person or persons you find actually committed the crime were *members of the conspiracy* you found to have existed.  Okay.  So you've got Count 27, the conspiracy.

Third, that the substantive crime, the mail fraud, was committed *pursuant to the common plan and understanding* you found to exist among the conspirators.  Okay.  So you got the plan to accomplish unlawful objective, to wit, the mail fraud.  So you're now at element three, and that the defendant that you're considering was a member of that conspiracy at the time that the mail fraud was committed.  Okay.  Conspiracy, mail fraud committed.  He's a *member of that conspiracy at the time the mail fraud was committed*.

And fifth, that the defendant could have *reasonably foreseen that the mail fraud crime might be committed by his coconspirators*.

If all of those five elements exist beyond a reasonable doubt and you find that by that proof standard, then you may find the defendant guilty of the substantive crime charged against him even though he did not personally participate in the acts constituting the crime or did not have actual knowledge of it.

Tr. 1534-1535 (emphasis added).  Lagona asserts that this instruction renders it "unclear whether there are really five or only four elements that must be shown."  Lagona Supp. Mem. of Law at 14-15.  Despite the fact that the word "four" or "fourth" was not used, the charge as given clearly states all five elements necessary for the jury to find Defendants guilty of the substantive mail fraud charges.   The jury instructions were therefore not misleading with respect to the correct legal standard, and the failure of Lagona's counsel to "make a meritless argument does not rise to the level of ineffective assistance." Kirsh, 54 F.3d at 1071.

### d.  Remaining Arguments

Defense counsel's failure to move to sever Lagona's trial from that of the codefendants was not unreasonable.  The argument that severance was warranted in the instant case has already been raised before this Court and denied.  Docket No. 33.  In

considering the motions of Gent and Gane[9] for severance, this Court noted that "separate trials may be warranted where the risk of prejudice is high," but concluded that, in the instant case, there was "no serious risk that a trial right will be denied or that the jury's verdict will be unreliable." Docket No. 33 at 4.  Thus, Lagona cannot be said to have been prejudiced by his counsel's failure to separately move for severance.  Kirsh,  54 F.3d at 1071.

Lagona next argues that trial counsel was ineffective due to his failure to present available exculpatory evidence.  He asserts that "a number of emails found on other parties' computers . . . clearly show that Lagona was not part of Gane's 'inner circle.'" Lagona Mem of Law, Docket No. 152, at 26-27.  Lagona does not, however, provide these emails or describe their contents with any specificity.  Similarly, Lagona asserts counsel was deficient for failing to call additional witnesses from St. Albert's church. Id. at 28.  He states that he "does not believe that counsel interviewed these potential witnesses to ascertain their recollection of Lagona's participation at the meeting, or lack thereof,"  Id. at 28.  Neither the record nor the motion papers provide any indication apart from Lagona's current speculation that the testimony of these witnesses would have been exculpatory. Unsupported, self-serving statements as to the value of evidence is alone insufficient to establish ineffective assistance of counsel.  United State v. Mejia, 18 Fed. Appx. 20, 23, (2d Cir. 2001), cert denied 534 U.S. 1035 (2001), citing Underwood v. Clark, 939 F.2d 473, 475-476 (7th Cir. 1991).  Further, a counsel's decision " 'whether to call specific witnesses - even ones that might offer exculpatory evidence - is ordinarily not viewed as a lapse in professional representation'" Grant v. Ricks, 151 Fed. Appx. 44, 45 (2d Cir. 2005), quoting

---

[9]These motions were made prior to Gane's decision to plead guilty. Docket Nos. 20, 21, 33, 35.

United States v. Best, 219 F.3d 192, 201-202 (2d Cir. 2000).

Defense counsel's decision not to challenge the capacity of Lorenzo Altadonna to testify, as Largona argues he should have, is not called into question on this record. Altadonna's videotaped deposition was played at trial following this Court's finding that he was unavailable for medical reasons pursuant to Rule 804 (a)(4) and the deposition admissible pursuant to 804 (b)(1).  Tr. 370-371.  Altadonna's deposition was initially videotaped as a precaution prior to his undergoing surgery, and admitted into evidence at trial after it was determined that chemotherapy had rendered the witness too physically weak to appear. Id.  There is nothing in the record that would support Lagona's conclusory assertion that "Altadonna's mental condition was highly questionable." Lagona Mem of Law, Docket No. 151, at 29.  Further, Altadonna was questioned regarding the impact of his illness on his memory.  Altadonna Dep. At 173-174. Any inconsistencies in or credibility issues with Altadonna's testimony itself were within the province of the jury to resolve. Guadagna, 183 F.3d at 129.

Lagona finally argues that defense counsel was ineffective in failing to cross-examine Gane on his "intent to say and testify to whatever the [G]overnment wants him to say." Lagona Mem of Law, Docket No. 152, at 31.  Contrary to this assertion, defense counsel specifically asked Gane about his response to investigators, "[w]hatever you need," when asked to testify.  Tr. 334.  Defense counsel further cross-examined Gane on his hope and expectation that he would receive a lower sentence as a result of testifying on behalf of the Government. Tr. 331-335.

The individual arguments raised by Lagona are without merit, and therefore he has failed to show that his counsel's performance fell below an objective standard of

reasonableness.  <u>Strickland</u>, 466 U.S. at 686-688.  A new trial is not therefore warranted due to ineffective assistance of counsel, or any of the individual alleged errors asserted in support of that argument.  Lagona's Rule 33 motion is denied.

## IV. CONCLUSION

There was sufficient evidence to support the jury's verdict with respect to all charges, therefore the Rule 29 motions for judgments of acquittal are both denied.  Neither Defendant has established that circumstances exist warranting a new trial, and the Rule 33 motions are also denied.

## V. ORDERS

IT HEREBY IS ORDERED, that the Motions and Supplemental Motion for Judgments of Acquittal of Defendant Lagona (Docket Nos. 90, 144) and Defendant Gent (Docket No. 88) are DENIED;

FURTHER, that the Motions and Supplemental Motion for a New Trial of Defendant Lagona (Docket Nos. 92, 145) and Defendant Gent (Docket No. 123) are also denied.

SO ORDERED.


Dated:   May 19, 2012
              Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
Chief Judge
United States District Court

34